IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 24-cv-00115-PAB-KAS

KRF LOT6, LLC, a Colorado limited liability company,

     Plaintiff,

v.

JIFFY LUBE INTERNATIONAL, INC., a Delaware corporation,

     Defendant.

_____

**ORDER**
_____

     This matter comes before the Court on Defendant Jiffy Lube International, Inc.'s Motion to Dismiss [Docket No. 19].  Plaintiff KRF Lot6, LLC ("Lot6") filed a response, Docket No. 20, and defendant Jiffy Lube International, Inc. ("Jiffy Lube") filed a reply. Docket No. 24.  The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I. BACKGROUND[1]**

     Lot6 owns the real property described as Lot 6, Commerce City Plaza Filing No. 2, Adams County, Colorado ("the property"), located at 6155 Parkway Drive, Commerce City, Colorado.  Docket No. 5 at 2, ¶ 5.  In March 2021, Lot6 and Jiffy Lube began negotiations regarding Jiffy Lube leasing the property and constructing certain improvements to open an automobile service center.  *Id.*, ¶ 6.  On March 1, 2022, Lot6 and Jiffy Lube entered into a ground lease agreement for the property ("the lease").  *Id.*, ¶ 8.  The initial lease term is 15 years, with five options to extend the lease for an

_____

[1] The following facts are taken from the complaint, Docket No. 5, and are presumed true for the purpose of ruling on the motion to dismiss.

additional term of five years each.  *Id.*, ¶ 9.  The initial monthly rent is $5,000.  *Id.*, ¶ 10.
The lease provides that rental payments will begin on either the date that Jiffy Lube
receives a certificate of occupancy for its service center or one year from the date Jiffy
Lube is issued a building permit, whichever is earlier.  *Id.*

Section 8 of the lease gives Jiffy Lube ninety days to conduct due diligence
regarding the property and the proposed improvements, which would include
completing any surveys and environmental assessments and submitting a development
application and preliminary site plan to the appropriate governmental authorities ("the
Due Diligence Period").  *Id.*, ¶ 11.  Before the expiration of the Due Diligence Period, the
lease offers Jiffy Lube the option to terminate the lease for any reason or to keep the
lease in effect and pay Lot6 an amount equal to two months' rent as a "Permitting
Deposit."  *Id.*, ¶ 13.  If Jiffy Lube elects not to terminate the lease during the Due
Diligence Period, the lease provides Jiffy Lube an additional one hundred and twenty
days from the end of the Due Diligence Period to continue to pursue and secure the
necessary governmental approvals (the "Permitting Period").  *Id.*, ¶ 14.  The lease
states that, if the parties "are waiting solely on any pending final proceeding or hearing
from the municipality," the lease will not terminate until the parties receive that final
approval or denial.  *Id.* at 3, ¶ 17.

Jiffy Lube chose to proceed after the expiration of the Due Diligence Period and
continue the permitting process by paying the Permitting Deposit on May 12, 2022.  *Id.*,
¶ 15. Following the expiration of the Due Diligence Period and Jiffy Lube's payment of
the Permitting Deposit, Jiffy Lube no longer had the right to terminate the lease at will,
and its obligations under the lease became subject to the permitting process.  *Id.*, ¶ 16.

2

Jiffy Lube submitted its building plans to Commerce City authorities on August 16, 2022. *Id.*, ¶ 18.

On September 28, 2022, Lot6 and Jiffy Lube amended the lease agreement to provide Jiffy Lube additional time to obtain the required government approvals. *Id.*, ¶ 19.  The amendment extends the Permitting Period until July 1, 2023. *Id.*  The amendment also allows Jiffy Lube to further extend the Permitting Period for another month by paying an additional $5,000. *Id.*, ¶ 21.  When the parties agreed to the amendment, it was the parties' mutual understanding that Jiffy Lube could not terminate the lease subject only to governmental approval of its plans and that Jiffy Lube "would diligently pursue obtaining the Governmental Approvals, including, without limitation, addressing all issues and concerns raised by the City as expeditiously as possible." *Id.*, ¶ 19.

On June 29, 2023, Jiffy Lube exercised the option to extend the Permitting Period to August 1, 2023. *Id.*, ¶ 21.  In email correspondence dated June 28–29, 2023, Jiffy Lube's representative, James Buechele, estimated that permitting would be approved in October 2023. *Id.*, ¶ 22.  He suggested that the parties execute a second amendment to the lease that would extend the Permitting Period through December 15, 2023, in exchange for an additional $5,000 Permitting Deposit. *Id.*

As of July 2023, Jiffy Lube's plans had been informally approved by Commerce City authorities, pending the resolution of minor conditions. *Id.*, ¶ 25.  Both parties understood that the plans had been effectively approved and that formal city approval was forthcoming. *Id.* at 4, ¶ 26.

Before final approval by the city Jiffy Lube sent Lot6 a notice of termination on July 19, 2023. *Id.*, ¶ 27. The notice of termination relied on language in Section 8 of the lease that states:

> In the event that Tenant elects to terminate the Ground Lease after the expiration of the Due Diligence Period for any reason other than Tenant's inability to secure all necessary Government Approvals, the Security Deposit and the Permitting Deposit shall revert to Landlord as liquidated damages for Tenant's failure to continue this Ground Lease. . . .

*Id.*, ¶ 28. Lot6 responded to the notice of termination, refuting that Jiffy Lube could terminate the lease and asserting that the lease was still in effect. *Id.*, ¶ 29.

On August 2, 2023, Mr. Buechele discussed Jiffy Lube's reasons for wanting out of the lease on a phone call with Lot6's Manager, George Balafas. *Id.*, ¶ 33. Mr. Buechele stated that Jiffy Lube sought to terminate the lease because of changes with respect to the "the greater environment." *Id.* In a letter dated August 23, 2023, Jiffy Lube claimed that, under Section 8(2) of the lease, Jiffy Lube had the right to terminate the lease if the government approvals "contain[ed] conditions and expenses or require the payment of exactions or contributions, which are unacceptable to Tenant in Tenant's commercially reasonable discretion." *Id.* at 5, ¶ 35.

At the time Jiffy Lube sent the notice of termination, it had satisfied almost all material conditions necessary to obtain governmental approval, and Jiffy Lube's decision to terminate was unrelated to those approvals. *Id.*, ¶ 37. Moreover, when the notice of termination was sent, Jiffy Lube had incurred all material costs or had specifically approved such costs. *Id.*, ¶ 38.

Lot6 brings a claim for breach of contract against Jiffy Lube for (1) Jiffy Lube's refusal to complete the governmental approval process, (2) Jiffy Lube's attempt to

terminate the lease for improper reasons, and (3) Jiffy Lube's breach of the implied covenant of good faith and fair dealing. *Id.* at 5–6, ¶¶ 41–49. Lot6 also brings a claim for promissory estoppel for Jiffy Lube's broken promises to diligently pursue government approval and to not terminate the lease until final approval or denial of Jiffy Lube's submitted plans. *Id.* at 6, ¶¶ 50–54.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("[W]e are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his]

claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

### III.  ANALYSIS

Jiffy Lube seeks to dismiss Lot6's claims for breach of contract and promissory estoppel.  Docket No. 19 at 1.  The Court will first consider Jiffy Lube's arguments that Lot6 has failed to adequately plead its breach of contract claim.

#### A.  <u>Breach of Contract</u>

To adequately plead a breach of contract claim under Colorado law, a plaintiff must allege facts that show "(1) the existence of a contract, (2) the plaintiff's performance of the contract or justification for nonperformance, (3) the defendant's failure to perform the contract, and (4) the plaintiff's damages as a result of the defendant's failure to perform the contract."  *Univ. of Denver v. Doe*, 547 P.3d 1129, 1139 (Colo. 2024).  Jiffy Lube argues that Lot6 has not plausibly alleged the third and fourth elements of its breach of contract claim.  Docket No. 19 at 7.

Jiffy Lube asserts that Lot6 has not pled sufficient facts to show that Jiffy Lube failed to perform under the lease agreement.  *Id.*  First, it contends that, under Section 8(2) of the lease, Jiffy Lube was entitled to terminate the lease based on the expense of the delay in waiting for governmental approval.  *Id.*  In relevant part, Section 8(2) states:

Tenant shall be responsible for the entire cost of obtaining and complying with such Governmental Approvals, provided however, the Governmental Approvals shall not contain conditions or expenses or require the payment of any exactions or contributions, which are unacceptable to Tenant in Tenant's commercially reasonable discretion, Tenant's sole remedy with respect thereto being to terminate the Lease within the time periods set forth in this Section 8.[2]

Docket No. 19-2 at 9 (footnote added). Jiffy Lube asserts that the "time periods" set forth in Section 8 reference any time after the Due Diligence Period but before Jiffy Lube received final governmental approval. Docket No. 19 at 9. Jiffy Lube maintains that the expenses associated with the delay in receiving government approval constituted "expenses" contained in the governmental approvals that were unacceptable to Jiffy Lube in its "commercially reasonable discretion." *Id.* at 8. Jiffy Lube notes that the complaint explicitly references Jiffy Lube's invocation of this provision of the lease agreement as its justification for terminating the lease. *Id.* As such, Jiffy Lube argues

---

[2] The Court finds that it may consider the terms of the lease agreement in resolving Jiffy Lube's motion to dismiss. "[I]n general, a motion to dismiss should be converted to a summary judgment motion if a party submits, and the district court considers, materials outside the pleadings." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation omitted). "However, notwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, 'the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Id.* (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)). The lease agreement is referenced throughout the complaint, and both Section 8 generally and Section 8(2) specifically are directly referenced. *See* Docket No. 5 at 4–5, ¶¶ 28, 35. The lease agreement is attached to the complaint as Exhibit A. *Id.* at 8–60. Moreover, the lease is central to Lot6's claims against Jiffy Lube. Therefore, the Court will consider the lease agreement without converting Jiffy Lube's motion to a motion for summary judgment. The Court notes that the complaint does not separately attach Exhibit A but incorporates it as a part of a single document. *See* Docket No. 5. For clarity of reference, the Court will cite the copy of the lease attached to Jiffy Lube's motion to dismiss, which is a separate exhibit whose authenticity has not been challenged.

that it was able to terminate the lease under this provision and that Lot6's complaint fails to adequately allege that Jiffy Lube breached the lease. *Id.* at 8–9.

In response, Lot6 makes two contradictory arguments. Docket No. 20 at 6–7. First, Lot6 argues that Jiffy Lube has identified the "time periods" referenced in Section 8 as the Due Diligence Period and the Permitting Period. *Id.* at 6. Lot6 asserts that Jiffy Lube has admitted that the Permitting Period ended on July 1, 2023. *Id.* Lot6 claims that this nullifies Jiffy Lube's argument regarding Section 8(2) because the complaint alleges that the notice of termination was sent on July 19, 2023. *Id.* However, Lot6 admits that Jiffy Lube exercised its option to extend the Permitting Period to August 1, 2023. *Id.* at 7 n.22. Indeed, the allegations in the complaint state that the Permitting Period was extended to August 1, 2023. Docket No. 5 at 3, ¶ 21 ("On or about June 29, 2023, Defendant exercised that option and extended the Permitting Period to August 1, 2023."). Lot6 maintains that, regardless, Jiffy Lube failed to properly invoke Section 8(2) as the basis for its termination of the lease until August 23, 2023 – after the end of the Permitting Period. Docket No. 20 at 7. Lot6 claims that the allegations in its complaint, therefore, plead facts that Jiffy Lube breached the lease agreement. *Id.*

Jiffy Lube also argues that the complaint fails to adequately allege that Jiffy Lube breached the lease by not diligently pursuing governmental approval. Docket No. 19 at 11. It maintains that the allegations in the complaint, in fact, show the opposite. *Id.* Jiffy Lube identifies an apparent contradiction in the allegations of the complaint. *Id.* at 12. First, the complaint alleges that Jiffy Lube had satisfied all material requirements for governmental approval before terminating the lease. *Id.* (citing Docket No. 5 at 5, ¶ 37). However, the complaint also alleges that Jiffy Lube failed to pursue governmental

approval diligently. *Id.* (citing Docket No. 5 at 6, ¶ 45). Jiffy Lube claims that Lot6's "competing allegations cannot both be true" and that, on this basis, Lot6 "has failed to plead a plausible cause of action for breach of contract premised on [Jiffy Lube's] pursuit of Governmental Approvals."[3] *Id.* Lot6 does not directly respond to Jiffy Lube's argument. *See generally* Docket No. 20. Instead, Lot6 maintains that Jiffy Lube's efforts to satisfy the requirements for governmental approval, along with Jiffy Lube's promise to continue to pursue governmental approval, bolster Lot6's claim that Jiffy Lube violated the implied covenant of good faith and fair dealing. *Id.* at 11.

As a final argument that Lot6 has failed to adequately plead the third element of its breach of contract claim, Jiffy Lube argues that the allegations in the complaint fail to demonstrate that it did not act in good faith. Docket No. 19 at 13. Under Colorado law, "every contract contains an implied duty of good faith and fair dealing." *Univ. of Denver*, 547 P.3d at 1140 (citation omitted). "The covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party." *Id.* "Discretion in performance occurs when the parties, at formation, defer a decision regarding performance terms of the contract leaving one party with the power to set or control the terms of performance after formation." *Ohio Ambulance Sols. LLC v. Am. Med. Response Ambulance Serv., Inc.*, No. 22-cv-00661-STV, 2023 WL 6314563, at *5 (D. Colo. Sept. 28, 2023) (quoting *City of Golden v. Parker*, 138 P.3d

---

[3] Jiffy Lube also supports its argument by reference to materials outside of the complaint. Docket No. 19 at 12 (citing Docket No. 19-3). Lot6 objects to Jiffy Lube's reliance on such materials. Docket No. 20 at 14. Unlike the lease agreement, the Court finds that these materials are not properly considered by the Court. *Alvarado*, 493 F.3d at 1215. Moreover, even if the Court were to find that these materials may be considered, for the reasons discussed below, the Court finds that it is unnecessary to review these materials to resolve the present motion.

285, 292 (Colo. 2006) (citation and quotation omitted)).  "The implied covenant cannot, however, be used to impose obligations that conflict with the express terms of the agreement or to inject substantive terms into the contract." *TBM Land Conservancy, Inc. v. Nextel W. Corp.*, 131 F. Supp. 3d 1130, 1136 (D. Colo. 2015) (citation and quotation omitted).

Jiffy Lube argues that the complaint contains only two allegations regarding its alleged breach of the duty of good faith.  Docket No. 19 at 13.  The complaint alleges that Jiffy Lube "breached its contractual obligations under the implied covenant of good faith and fair dealing by abusing and/or acting outside the scope of its discretion." *Id.* (quoting Docket No. 5 at 6, ¶ 47).  The complaint also alleges that, "to the extent Defendant had discretion to terminate the Lease because of conditions imposed by the Governmental Approval process . . . Defendant either acted outside the scope of its discretion, abused its discretion, and/or otherwise acted in bad faith." *Id.* (quoting Docket No. 5 at 5, ¶ 39).  Jiffy Lube argues that these allegations are conclusory. *Id.* Moreover, Jiffy Lube argues that the covenant cannot contradict the express terms of the contract. *Id.*  Under Section 8(2), Jiffy Lube maintains that the expense of receiving governmental approval was identified as proper grounds for terminating the lease. *Id.* Accordingly, Jiffy Lube asserts that the allegations in the complaint do not show that it breached its duty of good faith because it relied on the expense of receiving governmental approval as its justification for terminating the lease. *Id.* at 13–14.

Lot6 responds that the other allegations in the complaint support the plausibility of its claim that Jiffy Lube breached its duty of good faith.  Docket No. 20 at 11.  Lot6 claims that:

> It is more than plausible, for example, that Defendant did not make a good faith, "commercially reasonable" determination that permitting costs were "unacceptable" where: (1) "[b]oth Plaintiff and Defendant understood that the plans had been effectively approved and formal city approval was forthcoming"; (2) Defendant initially attempted to rescind the Lease based on a separate provision and without offering any justification; (3) during an August 2, 2023 phone call, Defendant told Plaintiff that it was terminating for reasons unrelated to permitting costs; and (4) after Defendant submitted its application and was aware of most or all permitting costs, it agreed in the Amendment to "diligently pursue obtaining the Governmental Approvals, including, without limitation, addressing all issues and concerns raised by the City as expeditiously as possible."

*Id.* Lot6 asserts that the amendment to the lease "creates a factual issue as to whether Defendant knew of the purportedly unacceptable permitting costs when it agreed to continue its diligent pursuit of the Governmental Approvals." *Id.* at 12. It argues that, by agreeing to the amendment in light of the known costs associated with receiving governmental approval, Jiffy Lube waived its discretion to later determine those costs as "unacceptable." *Id.* Finally, Lot6 points to federal cases which suggest that whether a party acted in good faith is generally a factual dispute that is not appropriately resolved on a motion to dismiss. *Id.* at 13 (citing *United States v. Conrad Publ'g Co.*, 589 F.2d 949, 954 (8th Cir. 1978); *Mathews v. Dow Chem. Co.*, 947 F. Supp. 1517, 1521 (D. Colo. 1996)); *see also Univ. of Denver*, 547 P.3d at 1140 ("Whether a party acted in good faith is a question of fact to be determined on a case-by-case basis.").

Turning to the fourth element, Jiffy Lube argues that the complaint has failed to adequately allege damages to support Lot6's breach of contract claim. Docket No. 19 at 14. Jiffy Lube argues that Section 8 of the lease includes a liquidated damages clause that "unambiguously prescribes a remedy for [Jiffy Lube's] termination after the Due Diligence Period." *Id.* at 9. Jiffy Lube relies on the provision of Section 8 that states:

> In the event Tenant elects to terminate the Ground Lease after the expiration of the Due Diligence Period for any reason other than [Jiffy Lube's] inability to secure all necessary Governmental Approvals, the Security Deposit and the Permitting Deposit shall revert to Landlord as liquidated damages for [Jiffy Lube's] failure to continue this Ground Lease and Landlord's receipt of same shall be Landlord's sole remedy hereunder; and thereafter neither party shall have any further rights or obligations under the Ground Lease, except that Landlord shall have all rights and remedies, at law or in equity, for violation of the surviving Obligations.

*Id.* Jiffy Lube asserts that because it terminated the lease after the expiration of the Due Diligence Period for a reason other than its inability to secure governmental approvals, Lot6 is only entitled to the liquidated damages of the forfeited deposits. *Id.* Jiffy Lube claims that:

> the structure of the deposit is evidence of the parties' intent to provide assurances to Plaintiff in the event [Jiffy Lube] were to terminate the Lease before all Governmental Approvals were in place: if [Jiffy Lube] had not continued past the Due Diligence Period, Plaintiff would have kept the Security Deposit and the Lease would have terminated; if [Jiffy Lube] elected not to continue past the permitting stage, Plaintiff would retain the Permitting Deposit.

*Id.* Jiffy Lube argues that because Lot6 has already received the deposits and can retain them, Lot6 has no further remedy. *Id.* As such, Jiffy Lube asserts that Lot6 has not, and cannot, plead damages in this case and that its breach of contract claim must be dismissed. *Id.* at 10.

Lot6 responds that the provision referenced by Jiffy Lube is not a liquidated damages clause. Docket No. 20 at 8. Instead, Lot6 maintains that this provision of Section 8 "simply concerns what happens to Defendant's deposits if it terminates the Lease for reasons other than inability to secure Governmental Approvals." *Id.* Lot6 asserts that the lease provides Jiffy Lube with multiple termination rights that can be triggered by "other specific situations," in addition to the right to terminate the lease for an inability to secure governmental approval. *Id.* at 8–9. For example, Lot6 explains

that, under Section 37 of the lease, Jiffy Lube is entitled to terminate the lease if Lot6 fails to prevent neighboring tenants from engaging in certain activities affecting Jiffy Lube's business.  *Id.*  Lot6 argues that Section 8 of the lease is directed to distinguishing between the circumstance where Jiffy Lube terminates the lease because it could not receive governmental approval and circumstances where Jiffy Lube terminates the lease under these other termination rights.  *Id.* at 8.  In the first circumstance, Lot6 asserts that Section 8 entitles Jiffy Lube to a return of its deposits, whereas Jiffy Lube forfeits its deposits in the other circumstances.  *Id.*  Lot6 maintains that the provision does not otherwise liquidate its damages for Jiffy Lube's wrongful termination of the lease.  *Id.*

Jiffy Lube replies that the liquidated damages clause does not apply to termination under Section 37 but applies instead to termination under Section 8, which is the provision Jiffy Lube invoked to terminate the lease.  Docket No. 24 at 7.  Jiffy Lube argues that a "[r]efusal to apply the Liquidated Damages clause to the section in which it is found and instead attempting to apply it to other sections entirely is nonsensical."  *Id.*  Jiffy Lube asserts that "Section 8 is not a broadly applicable section on termination," but "is specific to 'due diligence and governmental approvals'" and that its applicability is expressly circumscribed to "time periods set forth in this Section 8." *Id.*

The Court will consider first Jiffy Lube's argument that Lot6 cannot plead damages because it has already received the damages that it is entitled to under Section 8.  In doing so, the Court will first consider whether the liquidated damages provision applies to the circumstances of this case.  The Court will then consider

whether the provision is enforceable.  Lastly, the Court will consider whether the provision precludes Lot6 from bringing a breach of contract claim for actual damages.

Under Colorado law, in interpreting a contract, the court's "primary goal is to give effect to the parties' intent."  *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022).  "The parties' intent is primarily determined from the language of the instrument itself."  *Id.* (citing *Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000)).  In determining the parties' intent, the court "must first establish whether the provisions of the parties' agreement are ambiguous."  *Id.*  In making this determination, the court examines the instrument's language and construes the language in harmony with the plain and generally accepted meaning of the words employed.  *Id.*  Moreover, "[t]he meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation."  *Univ. of Denver*, 547 P.3d at 1140 (citation omitted).  When a written contract is complete and free from ambiguity, it is deemed to express the parties' intent and is enforced according to its terms.  *French*, 509 P.3d at 449.  The mere fact that the parties disagree as to the proper interpretation of a contract does not itself establish an ambiguity in the contract. *Id.*

The Court finds that the lease applies to the circumstances of this case and unambiguously limits Lot6's remedies.  Considering the agreement as a whole, the Court finds that Sections 2, 8, and 22 of the lease are all relevant in determining the meaning and scope of the liquidated damages provision in Section 8.  Section 2 identifies two significant dates, the Effective Date and the Commencement Date.  Docket No. 19-2 at 2, § 2.  The lease states that it "shall be in effect" when the lease is

executed and a $10,000 security deposit has been paid.  *Id.*  However, Jiffy Lube's obligation to pay rent does not begin until the Rent Commencement Date, which is determined by either the date Jiffy Lube receives a certificate of occupancy or one year from the date the building permit is issued.  *Id.*  Section 8 establishes the parties' rights and obligations during the time that Jiffy Lube pursues governmental approval to open its service center on the property.  *Id.* at 7–10, § 8.  Section 22 enumerates the events that constitute default by Jiffy Lube under the lease.  *Id.* at 17–18, § 22.  These events include Jiffy Lube's failure to pay rent, its failure to "materially comply with any of the non-monetary terms" of the lease, its abandonment of the property, and its use of the property in a manner prohibited by the lease.  *Id.*  Section 22 also identifies the events that constitute Lot6's default under the lease.  *Id.* at 20, § 22.  Section 22 further provides the parties' remedies for the other party's default.  *Id.* at 18–21, § 22.  Section 22 includes a separate liquidated damages provision as part of Lot6's remedies:

> If Landlord shall elect to terminate this Lease, then it may recover from Tenant, and Tenant shall pay to Landlord on demand, as and for liquidated and agreed final actual damages for Tenant's default, an amount equal to the difference between (A) all Monthly Rent, Additional Rent and other sums that would be payable under this Lease from the date of such demand for what would be the then unexpired Term in the absence of such termination, and (B) the fair market rental value of the Leased Premises over the same period (net of all expenses and all vacancy periods reasonably projected by Landlord to be incurred in connection with the reletting of the Leased Premises), with such differential discounted at the rate of five percent (5%) per annum.  Nothing herein shall be construed to affect or prejudice Landlord's right to prove, and claim in full, unpaid rent or any other amounts accrued prior to termination of this Lease.

*Id.* at 18–19, § 22

Turning to Section 8, this provision of the lease is titled "DUE DILIGENCE AND PROPERTY CONDITION: DUE DILIGENCE AND GOVERNMENTAL APPROVALS." *Id.* at 7, § 8.  The provision governs the period between the effective date of the lease

15

and the date when all governmental approvals for opening the service center have been approved or denied. *See id.* at 7–10, § 8. The lease divides this time into two different periods: the Due Diligence Period and the Permitting Period. *Id.* at 7, § 8. First, the lease allows Jiffy Lube to conduct various preliminary assessments to determine whether it should construct the service center. *Id.* This period lasts for ninety days from the effective date. *Id.* During the Due Diligence Period, Jiffy Lube may "terminate the Ground Lease in its sole discretion by providing written notice" or it may "elect to keep the Ground Lease in effect and shall, on or before expiration of the Due Diligence Period, pay to Landlord a dollar amount equal to two (2) month's rent." *Id.* If Jiffy Lube elects to pay this permitting deposit, it has one hundred and twenty days to secure the necessary governmental approvals. *Id.* If Jiffy Lube fails to secure governmental approval within the allotted one hundred and twenty days, Lot6 has the right, in its "sole discretion," to pursue obtaining governmental approval for the service center. *Id.* at 8, § 8.

> If Landlord does not elect to pursue such Governmental Approvals or is unsuccessful in obtaining them within one hundred twenty (120) days after commencing such efforts, either Landlord or Tenant may terminate this Lease by delivering written notice to the other party, in which case, the Security Deposit and Permitting Deposit paid shall be returned to Tenant, and thereafter neither party shall have any further rights or obligations under this Ground Lease, except for those matters that expressly survive termination of this Lease. In the event that Tenant elects to terminate the Ground Lease after the expiration of the Due Diligence Period for any reason other than Tenant's inability to secure all necessary Government Approvals, the Security Deposit and the Permitting Deposit shall revert to Landlord as liquidated damages for Tenant's failure to continue this Ground Lease and Landlord's receipt of same shall be Landlord's sole remedy hereunder; and thereafter neither party shall have any further rights or obligations under the Ground Lease, except that Landlord shall have all rights and remedies, at law or in equity, for a violation of the surviving Obligations. Upon Tenant's receipt of Governmental Approvals, Tenant shall diligently pursue construction using commercially reasonable efforts to construct Tenant's improvements on the Leased Premises. If Governmental Approvals are

16

obtained, the Security Deposit and Permitting Deposit shall apply towards the Base Rent owed as of the Rent Commencement Date.

*Id.*  Section 8 goes on to define the use of the property for which Jiffy Lube may seek governmental approvals, i.e., constructing and operating a service center.  *Id.* at 8–9, § 8.  It then identifies various obligations of the parties during the Due Diligence Period and finally provides Jiffy Lube with assurances by Lot6 as to Lot6's ability to lease out the property.  *Id.* at 10, § 8.

The Court finds that the damages and remedies provision identified in Section 8 governs the circumstances of this case, and not the remedies provided for in Section 22.  Lot6's claim for breach of contract is premised on the fact that Jiffy Lube failed to comply with the terms of the lease.  Although Jiffy Lube denies that Lot6 has pled facts that Jiffy Lube breached the lease, the Court will assume, arguendo, that the allegations in the complaint adequately allege that Jiffy Lube's termination of the lease during the Permitting Period constituted a breach of the lease.  It is true that Section 22 defines default under the lease to include Jiffy Lube's failure to "materially comply with any of the non-monetary terms" of the lease.  *Id.* at 17–18, § 22.  However, the Court finds that the specific conditions and remedies of Section 8 govern over Section 22's more general provisions.  *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (quoting *E–470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 801 (Colo. App. 2001), *aff'd*, 49 P.3d 1151 (Colo. 2002)) ("while every relevant provision must be considered and given effect, a more specific provision controls the effect of general provisions" (internal quotations omitted)).  Section 8 addresses termination of the lease during the Permitting Period both due to the parties' failure to secure governmental approvals and "[i]n the event that Tenant elects to terminate the Ground Lease after the

expiration of the Due Diligence Period for any reason other than Tenant's inability to secure all necessary Government Approvals."  Docket No. 19-2 at 8, § 8.  Because both Section 8 and Section 22 purport to proscribe the remedy in this circumstance, but Section 8 explicitly governs termination of the lease during the Permitting Period, its remedy is more specific and, therefore, governs.

Turning to the proper interpretation of Section 8, Lot6 contends that the provision simply identifies what would happen to Jiffy Lube's deposits should Jiffy Lube choose to terminate the lease.  Docket No. 20 at 9.  However, this interpretation would render certain terms of the contract meaningless.  Section 8 does more than proscribe who is entitled to the deposits under different if-then situations.  Instead, the lease states that the retention of these deposits will serve "as liquidated damages for Tenant's failure to continue this Ground Lease and Landlord's receipt of same shall be Landlord's sole remedy hereunder; and thereafter neither party shall have any further rights or obligations under the Ground Lease, except that Landlord shall have all rights and remedies, at law or in equity, for a violation of the surviving Obligations."  Docket No. 19-2 at 8, § 8.  Lot6's interpretation would render the language quoted above nugatory. However, "[e]ach word in an instrument is to be given meaning if at all possible." *U.S. Fid. & Guar. Co. v. Budget Rent–A–Car Sys., Inc.,* 842 P.2d 208, 213 (Colo. 1992).  As such, the Court rejects an interpretation of the provision that would render meaningless the text that expressly limits Lot6's ability to recover.  Instead, the Court finds that the contract means what it says, namely, that Lot6's receipt of deposits is its "sole remedy," as "liquidated damages," for Jiffy Lube's termination of the lease.  Docket No. 19-2 at 8, § 8.

Lot6 further argues that Section 8 is inapplicable to the circumstances of this case because Jiffy Lube wrongfully terminated the lease.  Docket No. 20 at 7.  It asserts that the phrase "terminate the Ground Lease after the expiration of the Due Diligence Period for any reason other than Tenant's inability to secure all necessary Government Approvals" refers only to those other termination provisions in the lease where Jiffy Lube had the right to terminate the lease without breaching the agreement.  *Id.* at 7–9.  Lot6 contends that Section 8 does not create an "at-will termination right" for Jiffy Lube.  *Id.* at 1–2.

Lot6's interpretation of Section 8, and specifically of the liquidated damages clause, is contrary to the plain language of the provision and the ordinary meaning of the terms employed by the parties.  The language in this provision indicates that the parties intended it to cover all circumstances where Jiffy Lube terminated the lease, regardless of whether such termination was a breach of the agreement.  First, the lease uses the phrase "for *any* reason other than Tenant's inability to secure all necessary Government Approvals."  Docket No. 19-2 at 8, § 8 (emphasis added).  On its face, termination for "any reason" includes all reasons not specifically delineated.  The lease only distinguishes between Jiffy Lube's failure to secure governmental approvals and all other reasons why Jiffy Lube might terminate the lease.  It does not further specify that "any reason" relates only to those other reasons that the lease identifies as grounds for termination without penalty.

Moreover, the ordinary meaning of the terms of the liquidated damages provision incorporates the notion that Jiffy Lube's termination might also be a breach of the contract.  The lease states that Lot6's retention of the deposits serves "as liquidated

damages." *Id*.  Black's Law Dictionary[4] defines liquidated damages as "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party *breaches*.  If the parties to a contract have properly agreed on liquidated damages, the sum fixed is the measure of damages for a breach, whether it exceeds or falls short of the actual damages."  *Damages*, Black's Law Dictionary (12th ed. 2024) (emphasis added).  The parties' reasonable interpretation of the term "liquidated damages" presupposes that the termination was a breach of the contract.  Further evidence that this provision applies to circumstances where the termination was a breach of the contract is the parties' use of the word "remedy."  Docket No. 19-2 at 8, § 8.  Black's Law Dictionary defines remedy as "[t]he means of enforcing a right or preventing or redressing a wrong."  *Remedy*, Black's Law Dictionary (12th ed. 2024).  Given that termination of the lease is a precondition of the applicability of the liquidated damages provision, "remedy" here does not refer to any ability of Lot6 to prevent Jiffy Lube from terminating the lease.  Instead, it references Lot6's retention of the deposits as its means of redressing the wrong of Jiffy Lube's termination of the lease.  This is consistent with the common usage of the word.  *See Remedy*, Mirriam-Webster, https://www.merriam-webster.com/dictionary/remedy (last visited July 18,

---

[4] *Sch. Dist. No. 1 in Cnty. of Denver v. Denver Classroom Tchrs. Ass'n*, 433 P.3d 38, 41 (Colo. 2019) (citing *Renfandt v. N.Y. Life Ins. Co.*, 419 P.3d 576, 580 (Colo. 2018)) (courts "may consult definitions in recognized dictionaries to give undefined words their plain and generally accepted meaning"); *Weitz Co., LLC v. Mid-Century Ins. Co.*, 181 P.3d 309, 312 (Colo. App. 2007) ("Dictionaries may be used to assist in the determination of the plain and ordinary meaning of words."); *City of Arvada v. Colo. Intergovernmental Risk Sharing Agency*, 988 P.2d 184, 187 (Colo. App. 1999), *aff'd*, 19 P.3d 10 (Colo. 2001) ("it is not inappropriate to look to *Black's* where, as here, the phrase in question relates to a cause of action or other legal concept").

2024) (defining remedy as "something that corrects or counteracts" and "the legal means to recover a right or to prevent or obtain redress for a wrong").

Reviewing the lease as a whole, including its structure, as well as considering the plain meaning of the language chosen by the parties, the Court finds that Section 8(1) is a liquidated damages clause and Section 8 (2) applies to circumstances where Jiffy Lube wrongfully terminates the lease during the Permitting Period.  The complaint alleges that Jiffy Lube wrongfully terminated the lease during the Permitting Period, Docket No. 5 at 3, ¶ 21.  As such, the Court finds that the liquidated damages clause applies to the circumstances alleged in the complaint.

Next, the Court considers whether the liquidated damages provision is enforceable.[5]  Under Colorado law, "[a] liquidated damages provision is valid and enforceable only if three elements are satisfied: (1) the parties intended to liquidate damages; (2) at the time of the contract, the amount of liquidated damages was a reasonable estimate of the actual damages that a breach would cause; and (3) at the time of the contract, the amount of actual damages was difficult to ascertain." *Tremitek, LLC v. Resilience Code, LLC*, 535 P.3d 1005, 1011 (Colo. App. 2023) (citing *Ravenstar, LLC v. One Ski Hill Place, LLC*, 401 P.3d 552 (Colo. 2017).  Such a provision is "invalid as a penalty" if the amount of liquidated damages is "unreasonably large for the expected loss from a breach of contract." *Id.* (quoting *Klinger v. Adams Cnty. Sch. Dist. No. 50*, 130 P.3d 1027, 1034 (Colo. 2006)).  Here, the Court finds all three elements are satisfied.  First, while Lot6 now disputes whether the parties intended this provision to

---

[5] Although neither party briefed the issue, the Court finds that it is necessary to consider whether the liquidated damages provision is enforceable in order to resolve the motion to dismiss.

liquidate its damages, the intent of the parties is primarily determined through the plain meaning of the language of the contract, and the lease unambiguously refers to the retention of the deposits "as liquidated damages."  Docket No. 19-2 at 8, § 8; *French*, 509 P.3d at 449.  Second, at the time of the contract, the amount of liquidated damages appears to be a reasonable estimate of Lot6's damages.  The security deposit was $10,000, the equivalent of two months' rent.  Docket No. 19-2 at 2, § 2.  The first permitting deposit was also $10,000.  *Id.* at 7, § 8; Docket No. 5 at 2, ¶ 13.  Thus, the contract provided Lot6 with four months' rent for a period of 7 months on a lot that Jiffy Lube had not yet improved so that Jiffy Lube could conduct due diligence and complete the governmental approval process.  The Court finds that this is a reasonable estimate of Lot6's damages.  Moreover, the liquidated damages are not so large that it indicates that the clause is a penalty.

Furthermore, the Court finds that, at the time of the contract, the amount of Lot6's actual damages was difficult to ascertain.[6]  First, although Jiffy Lube had a maximum of 210 days in the Due Diligence Period and the Permitting Period to terminate the lease or obtain governmental approval, it could have terminated the lease one day into either

---

[6] The Court finds that, taking the allegations in the complaint as true, it can determine whether the actual damages were difficult to ascertain as a matter of law at the motion to dismiss stage.  *See Tremitek, LLC v. Resilience Code, LLC*, 535 P.3d 1005, 1011 (Colo. App. 2023) ("The enforceability of a liquidated damages provision is a question of law."); *Ravenstar*, 401 P.3d at 557 (analyzing whether the "ultimate actual damages were difficult to ascertain"); *Rohauer v. Little*, 736 P.2d 403, 411 (Colo. 1987) ("Finally, it cannot be said as a matter of law that as of the date of the contract the amount of actual damages likely resulting from a breach was readily ascertainable. . . . It is the difficulty in ascertaining damages at the time of the contract, not afterwards, that is relevant for purposes of enforcing a liquidated damages provision.  That difficulty was quite obvious in this case."); *c.f. Honey Dew Assocs., Inc. v. M & K Food Corp.*, 241 F.3d 23, 28 (1st Cir. 2001) ("Determining the validity of a liquidated damages clause is usually a fact-specific exercise.").

period or any time thereafter.  As such, the amount of time for which Lot6 would not be able to seek other renters for the property was uncertain, as were its damages. Moreover, the provisions of Section 8 are tied to the actions of third-party governmental actors, and the uncertainty surrounding the timing of their actions further rendered Lot6's actual damages difficult to ascertain.  Therefore, the Court finds that the liquidated damages provision of the lease agreement is valid and enforceable.

Finally, the Court will consider Jiffy Lube's argument that the complaint fails to allege facts that show Lot6 is entitled to damages beyond the money it received as deposits.  The complaint alleges that, on March 1, 2022, the parties entered into the lease agreement and proceeded to the Due Diligence Period.  Docket No. 5 at 2, ¶¶ 8, 12.  The complaint further alleges that Jiffy Lube "chose to proceed with the permitting phase by paying the required Permitting Deposit on or about May 12, 2022." *Id.* at 3, ¶ 15.  The complaint alleges that on September 28, 2022, the parties amended the lease to provide Jiffy Lube additional time to secure governmental approval and further provided an option for Jiffy Lube to extend the Permitting Period to August 1, 2023 by paying another $5,000 deposit.  *Id.*, ¶¶ 19–21.  The complaint alleges that, on June 29, 2023, Jiffy Lube exercised this option.  *Id.*, ¶ 21.  Accordingly, the allegations of the complaint, taken as true, establish that Lot6 received the security deposit and the permitting deposits.[7]  The allegations of the complaint, therefore, show that Lot6 has

---

[7] Jiffy Lube maintains that Lot6 has retained these deposits.  Docket No. 19 at 1. In light of the fact that the complaint contains no allegations that the deposits were returned and the fact that Lot6 does not deny that it has retained the deposits, the Court finds that it may be assumed that Lot6 has retained the deposits.

received the liquidated damages that it is entitled to under the lease for Jiffy Lube's early termination.  Docket No. 19-2 at 7, § 8.

"The rule in Colorado is that if there is a liquidated damages clause and the liquidated amount is paid and accepted, it constitutes the total amount of damages allowable."  *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 212 (Colo. 1984); *see also Larson v. Am. Nat'l Bank of Denver*, 484 P.2d 1230, 1232 (Colo. 1971) ("Larson's final argument is that the trial court erred in limiting damages against Thunderbird to the $7,000 liquidated amount.  We disagree. Thunderbird properly points out that when there is a liquidated damages clause, and there is a breach, once the liquidated amount is paid and accepted, it constitutes the total amount of damages allowable."); *Marvin v. Pueblo Dairymen's Co-op.*, 284 P.2d 238, 242 (Colo. 1955) ("We believe, and so hold, that under the marketing agreement in the instant case, the marketing association had no further remedy beyond the stipulated amount for liquidated damages, because the producer was not bound as to any specified time and did deliver and perform under the contract for a period of eleven years and exercised his right to quit and complied with the terms of the agreement in connection therewith."); *Medema Homes, Inc. v. Lynn*, 647 P.2d 664, 667 (Colo. 1982) (affirming trial courts determination that "purchasers' liquidated damages claim inapplicable since they had availed themselves of their legal and equitable rights to consequential damages").  This is consistent with the holding of other courts who have considered the issue.  *See Blood v. Gibbons*, 288 Md. 268, 274 (1980) ("It should furthermore be recognized that if a deposit is forfeited as liquidated damages, a claim may not then be made for actual damages."); *Ecology Servs., Inc. v. GranTurk Equip.,*

*Inc.*, 443 F. Supp. 2d 756, 773–74 (D. Md. 2006) ("if the fact finder finds that either document containing the liquidated damages clause is part of the contract, Plaintiff cannot collect its claimed compensatory damages in this case, such as its interest and finance charges paid during the time period when the trucks were late, as such damages are subsumed by the liquidated damages clause"); *New York Dock Co. v. City of New York*, 283 N.Y.S. 2, 3 (N.Y. App. Div. 1935) ("The contract does provide for liquidated damages for such delay and the city has asserted its claim to such liquidated damages and has deducted the amount thereof from the amounts due to the appellants under the contract.  The city is therefore precluded from any recovery from the appellants of actual damages."); *Sheffield v. Paul T. Stone, Inc.*, 98 F.2d 250, 251–52 (D.C. Cir. 1938) ("In this context, we understand 'forfeit' the deposit to mean, keep it as liquidated damages and call the contract off.  The clause assures this remedy to the seller on the buyer's default and provides that, if the seller once adopts it, he cannot change his mind and require the buyer to complete the contract.").  Here, the complaint establishes that Lot6 has received all the remedy that it is entitled to.  As such, "the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.  Because the Court has found that Lot6 has failed to meet the pleading standard for its breach of contract claim, the Court declines to consider the parties' remaining arguments.  Accordingly, the Court will grant the motion to dismiss as to Lot6's breach of contract claim.

## B.  Promissory Estoppel

To adequately plead a claim for promissory estoppel under Colorado law, a plaintiff must allege facts that show "(1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial

character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise." *G & A Land, LLC v. City of Brighton*, 233 P.3d 701, 703 (Colo. App. 2010) (quoting *Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995)).  The presence of these elements will prevent the lack of a written contract from defeating a plaintiff's claim.  *Chidester v. Eastern Gas & Fuel Assoc.*, 859 P.2d 222, 225 (Colo. App. 1992).  The promise must be "clear and unambiguous."  *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 114 (Colo. App. 1994).  It must also be sufficiently definite to allow a court to understand the nature of the obligation.  *Soderlun v. Pub. Serv. Co. of Co.*, 944 P.2d 616, 620 (Colo. App. 1997).

Jiffy Lube argues that claims for promissory estoppel are "applicable only in the absence of an otherwise enforceable contract."  Docket No. 19 at 14 (quoting *Peace v. Parascript Mgmt., Inc.*, 59 F. Supp. 3d 1020, 1029 (D. Colo. 2014)).  Jiffy Lube asserts that Lot6's claim for promissory estoppel is based on the promise that Jiffy Lube will diligently pursue governmental approval.  *Id.* at 15.  It maintains that this promise is contained in the party's contract.  *Id.* (citing Docket No. 19-2 at 7–10, § 8).  As such, Jiffy Lube maintains that Lot6's promissory estoppel claim is barred by the existence of the enforceable lease agreement and that it should be dismissed.  *Id.*

Lot 6 responds that, under the Federal Rules of Civil Procedure, it is permitted to plead in the alternative and that a party may plead a breach of contract claim and a promissory estoppel claim based on the same conduct.  Docket No. 20 at 14 (citing *United Water & Sanitation Dist. v. Geo-Con, Inc.*, 488 F. Supp. 3d 1052, 1058 (D. Colo. 2020)).  Lot6 explains that, "[g]iven the parties' pre-litigation disagreements regarding

the terms of the Lease, Plaintiff pled a promissory estoppel claim in the alternative." *Id.*

However, Lot6 concedes that, "[i]f an enforceable contract is found to exist with respect

to all relevant terms, then Plaintiff acknowledges that dismissal of its estoppel claim is

proper." *Id.*

The complaint alleges that, "[a]fter the Due Diligence Period, Defendant

promised to diligently pursue obtaining the Governmental Approvals, including, without

limitation, addressing all issues and concerns raised by the City as expeditiously as

possible and specifically agreed that the Lease would not terminate until final approval

or denial of Defendant's submitted plans." Docket No. 5 at 6, ¶ 51. These promises

mirror the provisions of Section 8 of the lease. Under Section 8, "Tenant shall use

commercially reasonable efforts and diligence in submission of a development

application and preliminary site plan to the appropriate Governmental Authorities."

Docket No. 19-2 at 7, § 8. Additionally, the lease provides that "[i]f Tenant elects to pay

the Landlord the Permitting Deposit, Tenant shall then have an additional one hundred

twenty (120) days from the expiration of the Due Diligence Period, the ("Permitting

Period"), for Tenant to continue diligently pursuing and securing all Governmental

Approvals from all applicable Governmental Authorities and shall submit the Plans

consistent with the SDP approved by Landlord for Governmental Approvals within forty

(40) days from the expiration of the Due Diligence Period." *Id.* The lease states that "[i]f

at the end of the Permitting Period, Landlord and Tenant are waiting solely on any

pending final proceeding or hearing from the municipality, this Lease shall not terminate

until such final unappealable approval or denial." *Id.* at 7–8, § 8. The Court finds that

Jiffy Lube's promise to "diligently pursue obtaining the Governmental Approvals" and its

promise "that the Lease would not terminate until final approval or denial of Defendant's submitted plans" are incorporated in Section 8 of the lease.  Docket No. 5 at 6, ¶ 51.

Under Colorado law, "[p]romissory estoppel is an offensive theory of recovery, or cause of action, providing a remedy for those who rely to their detriment, under certain circumstances, on promises, despite the absence of any mutual agreement by the parties on all the essential terms of a contract."  *Wheat Ridge Urb. Renewal Auth. v. Cornerstone Grp. XXII, L.L.C.*, 176 P.3d 737, 741 (Colo. 2007) (citing *Vigoda v. Denver Urban Renewal Auth.,* 646 P.2d 900, 905 (Colo. 1982)).  "Recovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract."  *Id.*; *see also BBG Holding Corp. v. K Cap., LLC*, No. 20-cv-03268-MEH, 2021 WL 147085, at *3 (D. Colo. Jan. 15, 2021) ("The alternative remedy of promissory estoppel is never reached when there has been mutual agreement by the parties on all essential terms of a contract." (quoting *Scott Co. of California v. MK-Ferguson Co.*, 832 P.2d 1000, 1003 (Colo. App. 1991), *overruled on other grounds by Lewis v. Lewis*, 189 P.3d 1134 (Colo. 2008)).  The Court recognizes that other courts in this district have, at times, allowed both claims for breach of contract and promissory estoppel to be pled in the alternative. *See*, *e.g.*, *id.*; *Jaffrey v. Portercare Adventist Health Sys.*, No. 15-cv-02297-NYW, 2017 WL 1230469, at *9 (D. Colo. Apr. 4, 2017); *IIT, Inc. v. Commc'ns Distributors, LLC*, No. 20-cv-01580-RM-STV, 2021 WL 5240287, at *21 (D. Colo. Oct. 7, 2021), *report and recommendation adopted*, 2021 WL 5867098 (D. Colo. Dec. 10, 2021).  Here, however, the promises Lot6 seeks to enforce are contained within the lease, and Lot6 acknowledges that, "[i]f an enforceable contract is found to exist," "dismissal of its estoppel claim is proper."  Docket No. 5 at 6, ¶ 51; Docket No. 19-2 at 7–8, § 8; Docket

No. 20 at 14.  The allegations in the complaint establish that the parties entered into the lease agreement.  Docket No. 5 at 2, ¶ 8.  No party has contested the validity or enforceability of the lease or otherwise suggested that the parties disagreed on the material terms of the contract.  Moreover, the parties' dispute over the proper interpretation of the liquidated damages clause in Section 8 does not entail that the parties failed to agree on the material terms of the contract.  As the Court has noted, "[t]he mere fact that the parties disagree as to the proper interpretation of a contract does not itself establish an ambiguity in the contract," and "[w]hen a written contract is complete and free from ambiguity, [it is] deemed to express the parties' intent and [the Court will] enforce it according to its terms."  *French*, 509 P.3d at 449.  The Court declines to permit Lot6 to expand the remedies it is entitled to through a promissory estoppel claim when the parties' enforceable lease agreement expressly covers the promises Lot6 seeks to enforce and circumscribes the relief it is entitled to if Jiffy Lube breached the lease.  Accordingly, the Court will grant the motion to dismiss.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Jiffy Lube International, Inc.'s Motion to Dismiss [Docket No. 19] is **GRANTED**.  It is further

**ORDERED** that plaintiff KFR Lot6, LLC's first claim for relief is dismissed with prejudice.[8]  It is further

---

[8] The Court dismisses plaintiff's claims with prejudice because amendment would be futile considering the Court's analysis.  *Cloud v. Kansas*, 2024 WL 2272554, at *5 (D. Kan. May 20, 2024) ("The court grants the motion to dismiss with prejudice because amendment would be futile.").

**ORDERED** that plaintiff KFR Lot6, LLC's second claim for relief is dismissed with prejudice.  It is further

**ORDERED** that this case is closed.


DATED September 13, 2024.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge